**Opinion filed April 4, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00360-CR

_____

## RUSSELL JAY WILKES, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the County Court at Law No. 2**
**Ector County, Texas**
**Trial Court Cause No. 22-0388-CCL2**

## M E M O R A N D U M   O P I N I O N

Appellant, Russell Jay Wilkes, was charged by information for the offense of indecent exposure, a Class B misdemeanor. TEX. PENAL CODE ANN. § 21.08 (West Supp. 2023). Appellant entered a plea of not guilty and, after a jury trial, the jury found him guilty of the charged offense and assessed his punishment at ninety days' confinement in the Ector County Jail and a $1,000 fine. The trial court sentenced him accordingly.

Appellant raises four issues on appeal: (1) the evidence is insufficient to support his conviction, (2) the trial court erred when it denied Appellant's application and motion to secure a material and necessary out-of-state witness, (3) the trial court erred in its assessment of certain court costs, and (4) the trial court erred when it included the fine it assessed against Appellant in the bill of costs. We modify and affirm.

## I. *Factual Background*

Zoe Silvas worked at the Chick-fil-A restaurant located on University Boulevard in Odessa at the time of the offense. Her duties included taking orders via an iPad outside in the drive-through line; this involved using a portable card reader to take a customer's payment. The card reader could also be used to scan customers' cell phones; Silvas explained that Chick-fil-A maintains a "rewards app," which allows customers to earn loyalty points by scanning a barcode in their mobile phone application.

Another duty for which Silvas was responsible when working the drive-through line was identifying the vehicle of each customer when taking their order, to facilitate the speedy fulfillment and delivery of each customer's food order. Silvas explained that an overarching priority for employees who work the drive-through line at Chick-fil-A is speed—greeting a customer, entering their order, and securing payment as quickly as possible.

Silvas was working the drive-through line on July 20, 2021, when a white, single cab, Ford pickup with a black front pulled up into her lane. Inside the vehicle was a middle-aged white male. Silvas described him as "mostly bald" with a "scruffy" goatee. He was wearing a white shirt and blue jeans. The man gave Silvas his name and ordered a chicken sandwich; he intended to pay for the order with a credit card. As Silvas presented the portable card reader to scan the man's credit

card, she saw him smile and noticed his hands move. She thereafter looked down to the man's lap, and she saw that his pants were pulled down to his mid-thigh, and his erect penis was exposed. Silvas noticed that the man's pubic area appeared "white, shaved, bald" and that she did not see any pubic hair. Silvas testified that she looked at the man's penis for a "split second" before it "hit [her] brain" and she "looked up and froze." She saw the man smile a "creepy joker smile," a "[v]ery big smile," and noticed that he did not seem to be embarrassed. Silvas completed the payment process, and the man also scanned his loyalty rewards app. Then he drove away to the window, leaving Silvas frozen in shock.

Shaken, Silvas retrieved a headset from a coworker to communicate with personnel inside the restaurant to advise them about what had occurred in order to prevent others "from seeing what [she had seen]." She then continued to take drive-through orders for a brief period of time. When a police patrol unit entered the drive-through line, Silvas reported the incident and then went inside the restaurant to discuss the incident with her manager.

Three days later, law enforcement met with Silvas at the beginning of her shift to discuss what had occurred. Law enforcement later presented Silvas with a photo lineup to identify the driver of the white pickup who had exposed his genitals to her, but Silvas was unable to identify the perpetrator. Appellant was included in the photo lineup. Silvas and her director of operations reviewed the restaurant's surveillance video footage and Silvas positively identified the white pickup on the footage. They also retrieved the receipt from the restaurant's transaction with the driver of the white pickup. The timestamps from the video footage and the receipt matched, and the receipt showed Silvas as the person who took the perpetrator's order. Silvas testified (and Chick-fil-A's business records and video footage showed) that she took about twenty orders that morning and only two were from

3

persons who operated white pickups. The individual in the white pickup that Silvas indicated was not involved in the incident had ordered several meals, paid with cash, and entered the drive-through line about twenty minutes after the incident occurred. The individual in the first white pickup, which Silvas identified as being involved in the incident, paid with a credit card and ordered only one meal.

On cross-examination, Silvas agreed that in her written statement to law enforcement she neither mentioned that the perpetrator had scanned his Chick-fil-A loyalty app nor identified the white pickup as a Ford.

Alyssa Vega, the director of operations for this Chick-fil-A restaurant, explained that to use Chick-fil-A's loyalty rewards application, customers must create a profile with their personal information, such as a phone number and e-mail address, to accumulate digital points and rewards. When a customer scans their loyalty app at the restaurant, their individual loyalty identification number is auto-populated on the receipt for their order. The order receipt will also identify the specific Chick-fil-A location, the order number, and the last four digits of the credit card used to pay for the order, if applicable. Vega testified that although the receipt that is printed and given to the customer does not include the customer's name, Chick-fil-A maintains an internal system that records the name that the customer provides to the Chick-fil-A employee who takes the customer's order. Vega further testified that although she and Silvas reviewed the restaurant's surveillance video footage and Silvas had identified the white pickup driven by the perpetrator, the footage was never provided to law enforcement.

The receipt that Silvas and Vega identified that correlated with the white pickup on the surveillance video footage showed that (1) the last four digits of the credit card used for payment were "3091," (2) the credit card belonged to "Wilkes/Russell," and (3) the loyalty rewards number that was scanned was

89001141702048. The restaurant's record of the orders Silvas took that day showed that the customer who made this purchase gave "John" as their name and that the customer (John) was driving a white pickup.

A similar incident occurred at a Chick-fil-A location in Midland just three days after this incident. Jessica Watt testified that she worked for the Chick-fil-A franchise located on West Loop 250. On July 23, Watt was working the drive-through when a white pickup with a black front drove up. Watt described the driver as an older man with white facial hair; he was wearing a hat and sunglasses. She testified that she thought he had shoulder-length hair. Watt's task in the drive-through that day was to deliver food orders to the customers who had ordered and were waiting in their vehicle for their order. This particular order contained one bag of food and three drinks in a drink carrier.

Watt testified that as she handed the man his food order, she looked into the vehicle and saw the man's exposed genitalia. The incident was brief and the man drove away—Watt then reported it to a manager and the location's general manager. Watt reviewed the restaurant's surveillance video footage and was able to identify the white pickup. Watt and her managers also recovered a receipt that matched the order Watt recalled delivering to the white pickup. The time stamps from the surveillance video footage showed that the white pickup and the receipt matched. They contacted the police and Watt spoke with law enforcement later that evening. Like Silvas, Watt was unable to identify the perpetrator in a photo lineup, which included Appellant.

Stephanie Fitzpatrick, the operating partner of the Midland Chick-fil-A, testified that her location collects receipts in its system and that the receipts include the transaction number, the date, the customer's order, and the customer's loyalty number (if used), as well as the customer's name if they provide one. Fitzpatrick

5

explained that if a cashier entered the name that a customer provided them in the drive-through line, that name would override the name associated with the customer's loyalty rewards app (if they scanned the app).

Fitzpatrick reviewed the surveillance video footage of the drive-through for that day and retrieved the correlating receipt after Watt told her about the incident. The receipt recorded an order taken at 11:39 a.m., and the surveillance video footage showed a white pickup with a black front moving past the drive-through window at 11:41 a.m. The pickup's license plate number was Texas JFZ6302. The receipt also showed that (1) the last four digits of the credit card used to pay for the food order were "3091," (2) the credit card belonged to "Wilkes/Russell," (3) the loyalty rewards number ended in "2048," which is Appellant's loyalty number, and (4) the customer who made the food purchase was driving a white pickup and said his name was "John."

Appellant and his wife, Sherri Wilkes, testified. Sherri testified that she has been married to Appellant for seventeen years and that they are frequently intimate with each other. She testified that Appellant does not shave his pubic hair, that she sees him undressed every day, and that she would have noticed if he had shaved his pubic hair. She also stated that Appellant is bald. Sherri testified that their lives had been "devastated" by the accusations made against Appellant and that he is a good Christian man. According to Sherri, she and Appellant attend the same church as the owner of the Chick-fil-A located on West Loop 250, and that they go to this Chick-fil-A all the time. However, Sherri was not with Appellant on July 20 or July 23 during the times when the incidents at the Chick-fil-A locations allegedly occurred.

Appellant denied that he exposed himself at either Chick-fil-A location. He also denied that he shaves his pubic hair. He did not dispute that Silvas saw someone

6

with their penis exposed on the day of the incident, but he denied that he was the perpetrator. Appellant testified that he was driving a work pickup at the time of these incidents, that he purchased lunches at these two Chick-fil-A locations on July 20 and 23 in that vehicle, and that it was his vehicle in the surveillance video footage from the Midland location that showed license plate number JFZ6302. When asked whether there was anyone else that could have driven or been in the vehicle at the time, he stated, "No. It -- it would be me in there," and he "admit[ed] that, yes, [Appellant] did go pick up lunch, and that is [his] vehicle." Appellant agreed that he typically scans his loyalty rewards app when he orders food from Chick-fil-A and stated that he has not shared his rewards account with anyone else.

## II. *Standards of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). As such, we defer to the factfinder's

credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See Garcia*, 667 S.W.3d at 762; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *see also* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). This deference accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt if the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the

evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the [charging instrument], does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

We review a trial court's determination for whether an out-of-state witness is necessary and material for an abuse of discretion. *Ashby v. State*, 646 S.W.2d 641, 644 (Tex. App.—Fort Worth 1983, pet. ref'd). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or when it acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)).

### III. *Analysis*

#### A. *Sufficiency of the Evidence*

In his first issue, Appellant challenges the sufficiency of the evidence to support his conviction. As relevant to this appeal, a person commits the offense of indecent exposure if he exposes any part of his genitals with the intent to arouse or gratify his sexual desire, and he is reckless about whether another is present who

will be offended or alarmed by his act. PENAL § 21.08(a). "A person acts 'recklessly' when he is (1) subjectively aware of a substantial and unjustifiable risk that specific circumstances existed and (2) consciously disregards that risk." *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) (citing PENAL § 6.03(c)). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." PENAL § 6.03(c) (West 2021).

For his first issue, Appellant's primary point of contention is that the evidence is insufficient to identify Appellant as the person who committed the charged offense. Identity is an essential element of any criminal offense, and the State must prove beyond a reasonable doubt that the defendant is the person who committed, or was a participant in the commission of, the charged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984). Direct, in-court identification is the preferred method to establish a person's identity as the offender. *See, e.g.*, *Hime v. State*, 998 S.W.2d 893, 896 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Where an equivocal in-court identification is corroborated by other evidence, the defendant's conviction may be affirmed. *Prihoda v. State*, 352 S.W.3d 796, 803 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Anderson v. State*, 813 S.W.2d 177, 179 (Tex. App.—Dallas 1991, no pet.)). In such a case, the witness's uncertainty of the person's identity goes to the weight of the witness's testimony, not its admissibility. *Id.* However, identity may be proven by direct or circumstantial evidence, or by reasonable inferences from the evidence admitted at trial. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). Eyewitness testimony is not necessary. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App.

1986). Here, Silvas was never asked to identify Appellant in court. Nor could Silvas identify him in a photo lineup. Despite this, the circumstantial evidence linking Appellant to the offense is compelling.

Silvas testified that the driver of a white Ford pickup with a black front exposed his erect penis to her while she was working the drive-through of the Odessa Chick-fil-A on July 20. The man was middle-aged, white, and had scruffy gray and white facial hair. The man scanned his Chick-fil-A loyalty rewards app and paid with a credit card. According to Silvas and Vega, both the loyalty rewards number and credit card used to purchase the food belonged to Appellant.

Three days after this incident, at a Chick-fil-A location in Midland, a white, middle-aged man with gray and white facial hair drove a white Ford pickup with a black front into the drive-through and exposed his penis to a worker there (Watt). The pickup's license plate number was obtained from surveillance video footage and matched Appellant's work vehicle. Again, the perpetrator scanned his loyalty rewards app and paid for the food he ordered with a credit card. Further, the same loyalty rewards number and credit card, both of which are registered to Appellant, were used by the perpetrator to purchase food at the Odessa and Midland locations.

Appellant admitted that he was present at both locations, on July 20 and July 23, in his white Ford pickup with a black front, at the time both incidents occurred. He did not report that his credit card had been stolen or used by someone other than himself. He further admitted that he scanned his loyalty rewards app and paid for the food that he ordered with a credit card at both locations.

Nevertheless, and despite the evidence presented at trial, Appellant maintains that he did not commit the charged offense and that this is a case of mistaken identity. But the jury is the sole judge of the witnesses' credibility and of the weight to be given to the evidence and thus they were free to believe or reject all, part, or none of

Appellant's testimony and his theory of mistaken identity. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. Although Silvas was not able to positively identify Appellant as the perpetrator from a photo lineup or at trial—possibly because she was not asked to identify Appellant during the trial—eyewitness testimony was not required for the evidence to sufficiently establish Appellant's identity as the perpetrator of the offense; Appellant's identity may be inferred, and is logically inferred, from all the circumstances. *Ingerson*, 559 S.W.3d at 509; *Earls*, 707 S.W.2d at 85. As we have said, circumstantial evidence is as probative as direct evidence and can, without more, provide a sufficient basis to establish a defendant's guilt. *Carrizales*, 414 S.W.3d at 742 (citing *Hooper*, 214 S.W.3d at 13).

It is the jury's duty to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. If the evidence conflicts, we must presume that the jury resolved any conflicts in favor of the verdict, and we defer to the jury's determination in that regard. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. Therefore, we resolve any conflicting inferences, if supported by the record, in favor of the jury's determinations. *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

We have considered all of the evidence presented at trial in the light most favorable to the jury's verdict and we conclude that the record before us contains sufficient evidence from which a rational trier of fact could have logically inferred and found the essential elements of the charged offense beyond a reasonable doubt. Because the cumulative force and effect of the evidence, circumstantial or otherwise, is sufficient to support the jury's finding that Appellant was guilty of indecent exposure as charged in the information, we overrule Appellant's first issue.

B.  *Application to Secure Out-Of-State Witness*

In his second issue, Appellant contends that the trial court abused its discretion when it denied his pretrial application and motion to secure an out-of-state witness. Appellant contends that this denial violated his constitutional right to due process, the Sixth Amendment of the United States Constitution, and Article 1, Section 10 of the Texas constitution.

Criminal defendants have a right to compulsory process to obtain witnesses. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10.  The right to compulsory process is "the right to present a defense [and] the right to present the defendant's version of the facts as well as the prosecution's [version of the facts] to the jury so it may decide where the truth lies."  *Coleman v. State*, 966 S.W.2d 525, 527 (Tex. Crim. App. 1998) (internal quotation omitted).  However, the right to compulsory process is not absolute and is subject to trial court discretion.  *Ortegon v. State*, 267 S.W.3d 537, 542 (Tex. App.—Amarillo 2008, pet. ref'd) (citing *Drew v. State*, 743 S.W.2d 207, 225 n.11 (Tex. Crim. App. 1987)).  It does not guarantee the defendant the right to secure evidence from any and all witnesses; rather, compulsory process only guarantees the defendant's ability to obtain evidence that would be both material and favorable to his defense.  *Coleman*, 966 S.W.2d at 527–28.

To exercise this right, the defendant must make a plausible showing to the trial court, by sworn evidence or agreed facts, that a witness's testimony would be both *material and necessary* to his defense.  *Weaver v. State*, 657 S.W.2d 148, 150–51 (Tex. Crim. App. 1983) (citing *Ex parte Armes*, 582 S.W.2d 434 (Tex. Crim. App. [Panel Op.] 1979)); *see* CRIM. PROC. art. 24.28, § 4 (West 2009).  The same showing must be made—materiality and necessity—to justify the grant of the defendant's request to secure the attendance of an out-of-state witness under Article 28.24, Section 4, of the Texas Code of Criminal Procedure.  *Weaver*, 657

S.W.2d at 150–51; s*ee also* CRIM. PROC. art. 24.28, § 4; *Johnson v. State*, 746 S.W.2d 791, 794 (Tex. App.—Corpus Christi–Edinburg 1987, pet. ref'd); *Ashby*, 646 S.W.2d at 643.

In this case, the out-of-state witness that Appellant sought to secure is Whitney Wright, the prosecuting attorney for the incident that occurred at the Midland Chick-fil-A location. Wright moved from Midland County and accepted employment in Colorado between the time of the charged offense and the trial underlying this appeal. Although this appeal concerns only Appellant's indecent exposure conviction that is related to the incident at the Odessa Chick-fil-A location, Appellant anticipated before trial that the State would present—and it indeed filed its notice of intent to introduce—extraneous-offense evidence of the incident that occurred at the Midland Chick-fil-A location three days later.

The trial court held a pretrial hearing on Appellant's motion to secure Wright's attendance at trial. There, Appellant's trial counsel explained that Wright was a material witness because she could verify that Watt changed her statement concerning her description of the perpetrator in the Midland incident. Appellant's trial counsel argued that Wright would be material and necessary as an impeachment witness if Watt denied that she changed her statement during Appellant's upcoming trial regarding the Odessa Chick-fil-A location incident. Appellant's trial counsel candidly conceded, however, that "if she tells the truth that she did change her story, we won't need [Wright]." Appellant's trial counsel also noted that Wright had informed him that she was willing to testify by telephonic means on the issue of "materiality," but that she was unavailable to appear in-person due to work obligations.

The State responded that Appellant had not carried its burden to show that Wright was a material and necessary witness. In fact, Appellant's trial counsel

admitted that Wright may *not* be a material and necessary witness, depending on how the parties' strategies developed at trial. The State also pointed out that the charges arising from the Midland incident had been dismissed and thus the admissibility of any evidence offered from that case would be subject to a Rule 404(b) analysis.

The State further argued that, in the event that extraneous-offense evidence was offered and admitted, Wright's testimony would be inadmissible hearsay unless an exception for impeachment applied. Appellant had not, the State asserted, established that such an exception would apply to Watt's extraneous-offense testimony—that is, even if Watt had changed her story regarding the Midland perpetrator's description, Appellant had not shown that Watt had since recanted changing her statement. Appellant could have subpoenaed Watt to appear at this pretrial hearing, the State argued, to present her testimony and establish whether impeachment evidence would be necessary. Nor did Appellant attach an affidavit to his motion showing that he had spoken with Watt and learned that she had changed her statement again. Thus, Appellant had failed to establish a basis for an impeachment exception to the hearsay rule with respect to Wright's proposed testimony.

As the State urged, if Watt testified that she had provided two different descriptions of the perpetrator, her testimony would be *consistent* with Wright's testimony—thus nothing from Wright would be material or necessary. But for purposes of his motion and application, the State asserted, Appellant bore the burden to establish that Watt had or would change her statement a third time, that is, deny that she gave two different descriptions of the perpetrator. According to the State, Appellant had not done so. The State also emphasized that although the motion stated that Appellant was indigent (the motion requested that county funds be

15

dispersed to cover Wright's travel expenses and accommodations), Appellant had in fact retained trial counsel and no other evidence established his claimed indigency.

After considering the parties' arguments, the trial court stated that Appellant had shown the "potentiality" of materiality but had not established that the out-of-state witness (Wright) was clearly material and necessary. The trial court further noted that Appellant was free to secure Wright's attendance on his own, that is, without the assistance of county funds. After these comments, the trial court denied Appellant's motion.

We conclude that the trial court did not abuse its discretion when it denied Appellant's motion. As the trial court noted at the pretrial hearing, Appellant at most showed the *potential* materiality and necessity of Wright's attendance at trial. Appellant's trial counsel admitted that Wright might not be needed at trial. Indeed, Wright would not become a material and necessary witness if the State did not offer witness-testimony concerning the Midland incident or, even if it did, if Watt did not testify inconsistently with her previous statements, thus creating the need to impeach her. As the State pointed out, Appellant neither subpoenaed Watt to the pretrial hearing nor affixed an affidavit to his motion that established that Watt would or would not testify inconsistently. Thus, Appellant did not carry his burden to show that Wright was a material and necessary witness.

During trial, when the State alerted the trial court and Appellant's trial counsel that it intended to present Watt as a witness, Appellant's trial counsel renewed his objection to the trial court's denial of his motion and application to secure Wright as a witness, and re-urged his motion, which the trial court again denied. Appellant did not request a continuance in order to then secure Wright's attendance as a witness, although he asserted during the pretrial hearing that he would need to do so under

16

these circumstances.[1] Thus, and as the trial court noted at the hearing, even with the denial of his motion, Appellant was free to secure Wright's attendance on his own without the assistance of county funds.

Watt testified at trial about the perpetrator's description. She testified that she could not positively identify him but that she recalled that the man was wearing a hat and sunglasses. She also recalled "seeing grey hair on his shoulders, and [that] he had a lot of gray facial hair." During cross-examination, Appellant's trial counsel asked Watt if she had given Wright a different description of the perpetrator. Watt replied that she did not remember speaking to Wright. Appellant's trial counsel specifically asked Watt: "Do you remember telling [Wright] that the person had curly hair, was sticking out of a baseball cap?" Watt replied: "No." Appellant's trial counsel asked Watt: "Also, as far as what you do remember, it was shoulder-length hair, correct?" To which Watt replied: "Yes." Appellant's trial counsel also asked Watt if the perpetrator's pubic hair was "clean-shaven," to which she replied, "I don't know," although she testified on direct that she did not recall seeing any pubic hair.

Rule 613 of the Texas Rules of Evidence governs the use of extrinsic evidence to impeach a witness concerning their prior inconsistent statements. *See* TEX. R. EVID. 613(a)(4). Such extrinsic evidence is not admissible unless the witness is first

---

[1]Appellant neither objected at trial nor does he complain on appeal that Watt's testimony about the incident at the Midland Chick-fil-A location was inadmissible and constituted improper extraneous offense evidence. Because identity was a contested issue at trial, we note that such testimony could be admissible to establish Appellant's identity and to rebut his defensive theory. *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006) (to be admissible to prove identity by comparing common characteristics, the extraneous offense "must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'"); *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005) (extraneous offense evidence is admissible to prove identity when there are distinguishing characteristics and similarities that are common to the extraneous offense and the charged offense); *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996) (the common characteristics of the charged offense and the extraneous offense may act as the defendant's "signature"); *see also* TEX. R. EVID. 404(b)(1).

questioned regarding the prior inconsistent statement and the witness fails to *unequivocally* admit to making the statement. *Id.* In examining a witness about their prior inconsistent statement, a party must first advise the witness of (1) the contents of the statement, (2) the time and place that the statement was made, and (3) the person to whom the witness made the statement. TEX. R. EVID. 613(a)(1). Here, in cross-examining Watt, Appellant's trial counsel did not fulfill the second requirement of Rule 613(a)(1). Thus, because Watt was not properly impeached, extrinsic evidence, such as Wright's testimony, would not have been admissible.

The right to compulsory process hinges on a defendant's ability to show that the evidence he seeks to present at trial is *material and necessary* for his defense. Here, Appellant failed to make the required showing on either component. Thus, the trial court did not abuse its discretion when it found that Appellant had not carried his burden to prove that Wright was a material and necessary out-of-state witness. Accordingly, we overrule Appellant's second issue.

C. *Assessment of Court Costs and Inclusion of the Fine in the Bill of Costs*

In his third issue, Appellant contends that the trial court erred in its assessment of court costs. Appellant argues that because he was convicted of an offense that occurred after January 1, 2020, the court costs and fees should have been assessed in accordance with the statutes in effect at the time; in this regard, he asserts that certain itemized court costs should have been charged and assessed instead as a local consolidated court cost of $123. The State responds that the court costs assessed by the trial court are accurate, but that some costs should have been consolidated into a single amount. Here, the court costs assessed against Appellant separately charge costs for certain accounts and funds, such as the clerk of the court account, the county jury fund, the technology fund, and courthouse security.

Court costs are legislatively mandated obligations that result from a criminal conviction. *See Cadena v. State*, No. 11-22-00225-CR, 2023 WL 8459093, at *7 (Tex. App.—Eastland Dec. 7, 2023, no pet.) (mem. op., not designated for publication). The imposition of court costs against a criminal defendant is a "nonpunitive recoupment of the costs of judicial resources expended in connection with the trial of the case." *Id.* (quoting *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014)).

In 2019, the legislature enacted the Cost Act, which took effect on January 1, 2020, and completely revised the manner in which court costs are assessed in criminal cases. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, 2019 Tex. Gen. Laws 3981. Among other things, the Cost Act increased the amount of certain costs, consolidated others, repealed some costs altogether, and recategorized certain costs as fines. *See, e.g.*, *Contreras v. State*, No. 05-20-00185-CR, 2021 WL 6071640, at *6 (Tex. App.—Dallas Dec. 23, 2021, no pet.) (mem. op. on reh'g, not designated for publication).

As relevant here, the Cost Act consolidated several fees that are recited in trial court judgments into one local consolidated court cost fee which is to be assessed in every case. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.05, 2019 Tex. Gen. Laws 3981, 3985. Prior to the enactment of the Cost Act, all local fees were assessed individually. Here, Appellant's bill of costs shows that he was assessed several fees that were repealed, updated, consolidated, and superseded by the local consolidated court cost fee provided by the Cost Act. *See id.*; *see also* TEX. LOC. GOV'T CODE ANN. § 134.102 (West Supp. 2023).

The State argues that, although these repealed fees are improperly itemized and should be consolidated, their assessment is not improper because together they comprise the local consolidated court cost that is required by the Cost Act. *See* LOC.

GOV'T § 134.102. The State reasons that we should delete the first eight fees set forth in the bill of costs and replace them with the local consolidated court cost—the sum total of these eight itemized fees is the same as the statutorily mandated local consolidated court cost fee: $123. *See id.* The State thus concedes that Appellant's third issue is meritorious and should be granted, at least to the extent it requests that we modify the bill of costs to delete the itemized fees and replace them with the local consolidated court cost fee.

Here, Appellant simply asserts that his bill of costs should be "corrected," and he cites to Section 134.102(a) and to the "County Clerk's Misdemeanor Conviction Court Cost Chart" located on the State's court website. *Id.*; County Clerks' Court Costs, Fines, & Reimbursement Fees on Conviction Chart, https://www.txcourts.gov/media/1444861/county-court.pdf. As such, we understand Appellant's prayer for relief to comport with the State's concession. Therefore, we sustain Appellant's third issue and modify the bill of costs to delete the first eight designated fees assessed and replace them with the local consolidated court cost fee prescribed by Section 134.102(a): $123. *See* TEX. R. APP. P. 43.2(b); *Bryant v. State*, 642 S.W.3d 847, 850 (Tex. App.—Waco 2021, no pet.) (concluding that appellate courts are authorized on direct appeal to order a modification of a bill of costs independent of a finding of error in the trial court's judgment); *Cadena*, 2023 WL 8459093, at *9.

In his fourth issue, Appellant contends, and the State concedes, that the trial court erred when it included in the bill of costs the $1,000 fine that it assessed against Appellant when he was sentenced.

Unlike court costs, fines are punitive and a part of the convicted defendant's sentence. *See Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011); *Weir v. State*, 278 S.W.3d 364, 366–67 (Tex. Crim. App. 2009). A bill of costs

20

contains "items of cost." CRIM. PROC. art. 103.001(b) (West 2018). As such, an assessed fine cannot be included in the bill of costs. *See Williams v. State*, 495 S.W.3d 583, 591 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd).

The fine assessed against Appellant was erroneously included in the bill of costs. *See id.*; *see also* CRIM. PROC. art. 103.001(b); *Armstrong*, 340 S.W.3d at 767. The proper remedy when a trial court erroneously includes amounts as court costs is to modify the trial court's judgment and the bill of costs to delete the erroneously included amounts. *See, e.g.*, *Brumfield v. State*, 641 S.W.3d 568, 583 (Tex. App.—Tyler 2022, pet. ref'd). Accordingly, we sustain Appellant's fourth issue and modify the bill of costs to delete the $1,000 fine. *See id.*; *see also* TEX. R. APP. P. 43.2(b).

## IV. *This Court's Ruling*

As modified, we affirm the judgment of the trial court. *See* TEX. R. APP. P. 43.2(b).

W. STACY TROTTER

JUSTICE

April 4, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.